Our oral argument this morning, February 23, 2018, is Case No. 17-6025, N. Ray Benjamin M. Bennett, et al., the Paddock, LLC v. Benjamin M. Bennett, et al. All right, good morning, Counsel, on the television screen. Can you hear me okay this morning? Yes, Your Honor. Yes, Your Honor, certainly. All right, so we're starting with the appellant, obviously, so Ms. Briley, you may begin. Thank you, Your Honor. Good morning, Your Honors. Dutter's proposed cram-down is impermissible because under Iowa's common law of fixtures, there is no question that the manufactured home is real property. And nothing in Iowa's tax code changes this conclusion. First, as the Bankruptcy Court held, there's no question that the home is actually annexed to the reality, to the realty, excuse me. Second, the Bankruptcy Court raised some question whether the home and the underlying realty are put to the same use, but made no finding on this point. There's no serious question that the home and the underlying realty are put to the same use. Both are used as the debtor's homestead. The documents submitted to the Bankruptcy Court indicate that the lot on which the home sits is a homesite solely, to be used solely for the homestead. Debtors are using the home and the homesite as a homestead. The PADOC's differing financial interest does not change this use. The third prong of the test to determine whether the home is real property under Iowa common law is where the dispute lies in this matter. The PADOC, not the debtors, attached the home to the realty. That's important because the only intent that is relevant is the intent of the party attaching the home to the realty. Ms. Briley, when do we evaluate the issue of intent? Is it the time at which the manufactured home was placed or is it some other time period? It is at the time when the manufactured home is placed on the realty. Okay, so what was the evidence of the intent at the time the home was placed on the realty? Well, the evidence in this matter is the documents that were created when the home was sold to the debtors. But that's a different time frame than what you just said, which was the intent comes up at the time the home is placed and now you just said, well, it comes up at the time of the contract. So that's the question. Well, we don't, you know, I mean, unfortunately there's not a document that's been put into the record here that states that the PADOC's intent at the time that the home was installed. There is additional evidence, however, that the intent to install the home as a permanent accession, you know, that the PADOC had that intent when it installed the home. So if, excuse me, if the intent then was at the time the home, the mobile home or the manufactured home was installed, then all we can look at is how it was installed to make the determination of permanency. Isn't that correct? Because the contract didn't exist at that point in time. Yeah, well, I mean, I would, you're correct that the evidence, if the only evidence to show that the intent in 2003 was to make it permanent is the evidence, is a writing, a contemporaneous writing, and we don't have that, then we do need to look at the method of the installation. And frankly, that also supports the PADOC's intent in this case. The fact that the home can be moved does not defeat an intent to make it permanent or that it, you know, has become a permanent accession to the realty. I mean, you know, Cornell College versus Crane is clear about that. It's not required that the home be, you know, permanently or even physically attached to the realty. It is, you know, solely for use as a homestead, and that was the intent when the home was installed in 2003. The lot has always been there in order to support a home for use as a homestead. So that squares with Cornell College and with Ford. So that, I mean, I think the method of attachment, you know, indicates that it is a permanent accession to the realty. Well, actually, Ms. Briley, the method of attachment is some evidence of intent, I suppose. But if the home can be, as the bankruptcy judge found, jacked up and moved, doesn't that kind of change the picture? And don't we really have to look at what was the intent of the PADOC in terms of turning this home into a parcel of real estate? And if that's the factor we need to look at, what did the PADOC do to ensure that this home was annexed into and became part of the real estate? When the evidence shows that they kept it separate from the real estate in terms of they sold it under a bill of sale, well, that's about the only evidence we have, is they sold it under a bill of sale and it was always taxed as personal property. So how do we find the PADOC's intent to turn it into real property? Well, first, Your Honor, the fact that it's taxed as personal property does not defeat a showing under the common law. I understand that. That's why I'm asking. That's why I asked the question of how do we get to that intent. So the foundation, the testimony showed the foundation of the home is a pure footing foundation. Under Iowa law, a pure footing foundation for a manufactured home is a permanent foundation. When you look at section 414.28 of the Iowa Code, that states that for purposes of zoning of manufactured home communities, a pure footing foundation is a permanent foundation. And the law in Iowa is not that the home has to be attached to the realty so that it can never be moved. The structures in both Ford and in Cornell College were movable and in fact, in Cornell College, the structures were moved about the premises but because they were solely dedicated to the purpose of the realty, which was farm, farm use, they were basically necessary to the land. Here, you have the same structure. The home and the land are solely for use as a homestead. Now, site-built homes can be moved as well but they cannot be moved without significant damage to the home and the foundation and in this case, the only testimony about whether there would be damage to the home and the foundation came from Ms. Slaymaker, representative of the Paddock, and she testified that both the home and the foundation would be damaged by moving the home, by removing it from the site. But didn't she also testify that she did not know what the foundation was? She'd never seen it? She testified that she'd never actually looked at the foundation. She did testify that she understood the foundation to be similar to the foundations of the other homes in the community, that they were designed to be permanent foundations for these homes. But the only evidence here in terms of what actually was there was the debtors. Isn't that correct? Um, I would not agree that the only evidence of what was actually there is the debtors. There are photographs submitted that show that not only are the home, I mean, they don't show the foundation of the home but they show that there is concrete installed on the lots to make driveways and sidewalks to put up sheds. There are pictures of the debtors' home. It looks more or less like a site-built home. And, you know, in conjunction with all of the evidence that a pure footing foundation constitutes a permanent foundation for a manufactured home, the fact that the debtor observed that there may have been some imbalance in the foundation does not defeat the fact that this foundation attaches the home permanently in terms of the common lot to the underlying realty. Ms. Briley, if the debtor were to pay off the installment contract let's say the debtor won the lottery or inherited money pays off the installment contract, could the debtor then jack up that home and move it? The debtor could not just jack up the home and move it. The debtor would need to detach the home from the site. Would it be allowed? My question is, would it be allowed? Absolutely. The debtor would be permitted to move the home from the site provided that the debtor returns the site to the condition it was in before the foundation for the home was installed. And that's clear in the documents. But the debtor didn't put the foundation in. Nonetheless, the documents require that the foundation, that all of that be returned to the pre-foundation condition. What part of the contract says that? I don't have the contract in front of me, but it is in the ground lease which is the document submitted as 26-2. I don't know what page it's on right off the top of my head. But that is what Ms. Slaymaker testified to and it is in the document. Okay, because I don't recall seeing that in the document. I'm sorry? I don't recall seeing that in the document, but we'll figure it out. Unless your honors have additional questions, I would like to reserve the remainder of my time for rebuttal. Okay, thank you. Alright, Mr. Shortley for the Bennetts. Thank you, your honor. May it please the court. First, I'd like to note on the record that this is the first appellate argument I've had in almost 46 years of a practice of law, so that's kind of a red letter day for me. Well, welcome to appellate practice. Yes. When I first encountered this case, it ran through my head. This is a no-brainer. This is personal property. And I guess I based that upon my 40-some years of experience in practicing law, the first 12 of which I practiced was a general practice doing some real estate work and doing some debtor-creditor work on the ground and that sort of thing. And I prepared a nice summary of all my arguments to present to the court today, but I wasn't going to say anything more that isn't already said better in the briefs, so I'd like to take this approach. Let's play what if. Let's look at the documents in this case. Let's look at the facts in the record and look at the... Mr. Shortley, I'm going to interrupt you. Before we go through your what ifs, what do you believe the standard of review to be in this case? Is it clearly erroneous or is it a mixed question of fact and law that requires de novo review? If we're going to talk about the facts, is that a clearly erroneous standard or do you think the law has been applied correctly? I mean, I'm not exactly sure which way we're supposed to review what your position is on why Judge Collins should be affirmed. Your Honor, I see this as primarily a factual determination by the bankruptcy court. I think once the facts are determined as to what's on the ground and what's in the legal relationships between the parties, then the conclusion as to whether this is personal or real property is primarily determined. I believe that the proper standard of review then is the clearly erroneous standard. I think that the Iowa cases make it clear that there are three pronged tests to be applied and that if you review the Iowa cases, they all are primarily a factual analysis to which then they apply the readily discernible principles that are pretty clear under Iowa law. Let's take, for instance, the Ford case. In that case... Well, we know the test, so tell me what's so clear in this case about the intent of the paddock at the time that it installed this home on the lot? I think at the time the home was installed, I don't think there's any evidence of what their actual intention was at that time. I think we can look back to the record in this case and determine from their pattern and practice that their primary intent was to sell these homes to people and like the fancier trailer courts that we have, is to maintain essentially a community of manufactured homes, which is their declared intent in the documents. Mr. Shortley, let me ask you this. When you talk about their intent at the time the mobile home was placed and the underlying contract that was entered into between the parties, can't your... isn't it possible that your client agreed that it was a fixture so that intent is irrelevant at this point? Because he signed the contract saying that the manufactured home was a fixture under the lease agreement? Well, then why does the contract go on to say in several places that as long as they satisfy the requirements of the installment purchase contract under the personal property agreement, the installment contract agreement, as long as they satisfy those requirements and the secured party is satisfied, they can remove the home if they want to. But don't they need the consent of the landowner which would always be the pattern? Actually, let me go back to what you just said. Where does it say they can remove the home if they want to? Well, if you go to the lease, there are several places in the lease that say that they can remove the home. Point this to those, please. Alright. In part 3 of the lease there are counter statements of intent, I would suggest. First, the landowner and the resident agree that the home shall be installed as a permanent improvement and fixture, period. And that, of course, is what the appellant in this case is relying on. Yeah, I'm familiar with that. But you drop down a couple more paragraphs and they say the home and any other improvements covered under the financing documents may not be removed from the home site without the prior permission of the secured lender. Okay, so that says it can't be It says it may not be removed without the prior permission. The clear implication is that it can be removed. So you're saying by implication You're saying that the consent to removal is by implication, not direct. It sets certain conditions for the right to remove. But that's with the, Mr. Shortley, isn't the two elements that you talk about under part 3, one refers to the landowner and one refers to the secured creditor. And I understand that they're both the same in this case, but isn't there a distinction between landowner and secured creditor under the law? There certainly is, and that's one of the things that I was intending to talk about. The secured creditor in this case is clearly a secured creditor of and there's nothing in the record that talks about the title to the manufactured home or anything like that Well, hold it. The installment contract very clearly talks about the title to the manufactured home. It does. The title itself doesn't appear, but it talks about the title of the manufactured home remains in the seller's until the purchase price is paid in full, at which time title will be conveyed by a bill of sale. Right. So what do you mean there's nothing in the record about the title? Well, there's... I'm talking about the motor vehicle title part of it. That wasn't actually introduced into the record at all. Okay, well let's go back to my question that I had asked you, Mr. Shortley. I had asked you where does the contract allow the debtor to remove the home? Because you said the contract allows it, and I'm still trying to find that. Well, it's in that paragraph that I read to you, Your Honor. As long as they satisfy the requirements of the secured lender, they can remove the home from the property. Well, okay. Why don't you take a look at paragraph it's in section Roman numeral 8, paragraph 4. All right. The home may be removed with the consent of the landowner. No, that's not what it says. Pardon me? That's not what it says. Well, I don't have the exact language in front of me, and I look it up here. No, that's all right. You don't need to do that. What it says is... Kathy? What it says is the resident may not remove the home from the resident's home site without the prior written consent of the landowner. As long as a secured lender has a lien on security interest in the resident's home and leasehold interest in the home site, neither the resident nor the landowner may remove the home from the resident's home site except as a remedy to cure an event of default. Okay, so we again have a clause saying it cannot be removed that you are saying is actually a clause that allows removal if the consent is obtained, right? Right, and the agreement sets out the conditions for removal. Okay, well let's talk about the conditions for consent instead. So what would the debtor have to do to get the consent of either the landowner or the secured creditor to remove the home? Okay, the secured creditor would have to be satisfied that the home would remain in a reasonable condition. Well no, I'm asking for facts, not just generalities. Facts that are in the documents. Or the record. Yeah. Well, or better yet, let's talk about the law. If a contract says you cannot do something without the consent of somebody else, what is the law on getting that consent? Can that consent be unreasonably withheld? No. Or can the person giving the consent withhold consent in their sole discretion? What's the law on that? Well, I think the law of Iowa on that is that the withholding of the consent to remove one's property of another must be reasonable. And also the lease goes on to set out the conditions under which the property may be removed and what one must do in order to obtain the consent of the landlord. You have to first of all ensure the landlord, that the secured lender would not deem themselves insecure. I would suggest that's the meaning of that portion. And it goes on to say that if the house is removed, the homeowner must repair any damage that they do to the realty in the removal of the home. It goes on to require them to satisfy and if there's damage done in removing their other property that they place upon the lot, such as sheds and it even suggests that if they made plantings they could even remove their plantings and take them with them. Where is that found in the lease? In the ground lease? I believe that's in that section 8 and later on. ... ... Well, we'll dig through that. You've only got a couple minutes left, but I guess I'd like to hear from you as to why we should uphold the bankruptcy court's decision. Well, because I think the bankruptcy court's decision more clearly conforms to the rules set out of the common law set out by the Iowa Supreme Court. It's clear under the documents that the paddock is trying to have it both ways here. They're trying to have a permanent fixture, whereas the facts of the situation are that this house is placed upon piers that keep sinking into the ground and require re-leveling of the home. There's nothing in the record to suggest that the home can't be as readily removed as it was brought in there. There's nothing in the record that says that the home has been put together in such a fashion that it could not be unzipped, as they call it, and the two halves removed, placed on either wheels or on semis, depending on the way that it was brought in, or the mover that would be hired, and taken to another location. When you go through that entire series of events, though, couldn't you say the same thing about a home that's placed on a foundation? It can be moved. It may not be easy to move it, but even a home that's on a permanent foundation could be moved. When you start saying, well, we have to do this, we have to put wheels on it, we have to put axles on it, a foundation can sink just as easily as piers. What distinguishes this from any other homestead? This home was brought in on wheels, either on a couple of semis or on its own wheels, and moved onto these piers and zipped up. It was intended to be built as a prefabricated structure. And you're saying that evidence, that's in evidence somewhere? Well, I think it's clearly, the implication from the record is clear that the home was moved onto the property in 2003. But it doesn't say how it was moved on or how it was erected, does it? No, but it's a manufactured home, and I think the record clearly demonstrates what a manufactured home is. Well, thank you, Mr. Shorley. Let's move back to Ms. Briley. You have a little over four minutes. Your Honors, I would like to go back to the initial question about the timing of when the intent is measured. And upon reflection, I think I had assumed it was the moment when the home is attached to the realty, but looking back through the materials, there's nothing in the cases that specifically states it is measured at the time the home is attached or at the moment the home is attached to the realty. I think, however, that that is a reasonable conclusion, but here, there's no evidence that the paddock's intent would have changed between 2003 and 2006. As Mr. Shorley stated, this is a manufactured home community, and the homes were brought in for the purpose of providing a homestead for the residents. That intent is reflected in the documents and also is reflected in the method of attachment to the realty. And I would just also like to point out that while not only Iowa law supports the conclusion that the method of attachment is intended to be permanent, federal regulations require that piers be put into the ground to a certain depth in order to deal with the climate where we have freezing temperatures, and that's 24 CFR section 3285, subsection 312B. That's in the documents. Ms. Bradley, was that in was that part of the record? Yeah, it's argued in the brief, so it was not, as it's in the statute, it's not argued and, you know, it was not introduced to the bankruptcy court. It wasn't argued to the bankruptcy court? That particular statute was not cited to the bankruptcy court. Is there anything, Ms. Bradley, is there anything in the record that provides guidance on how other manufactured homes in that community were placed, whether they were on piers or foundations? I mean, is the Bennett's a and all the others, or, you know, I mean, is there anything in the record that explains how the manufactured homes are normally attached in the paddock? There's nothing in the record that provides a technical explanation of the foundations. No, not a technical explanation, just how many manufactured homes are on permanent foundation versus piers. Well, Ms. Slaymaker testified that the homes are all attached to the home in the same manner. So are they all on piers? Are they all on piers then? Your Honor, that, I don't know whether they're all on piers. So that's not in the record? That is not in the record. But it is my understanding that the likelihood is that they are all on piers. We did submit to the record a manufactured home foundation guide published by the Federal Housing Administration. I believe it's the FHA, regarding the various types of foundations that can be used to attach... That's not on the exhibit list though that was accepted by the court, is it? It was we request, the paddock requested that the court take judicial notice of it, submitted it with the supplemental brief, and no ruling was ever entered regarding that particular request. Does it matter? No. My question is, does it matter whether it's a pier foundation or a poured foundation? Does it matter? Your Honor, no it doesn't matter. A pier foundation or poured foundation, they all constitute the types of foundation that indicate an intent to make it a permanent accession to the realty. And it doesn't matter because in the Cornell College case the house was on skids, or the building. The grain bins were on skids and they were moved about the property. They did not stay in the same place. And those were considered fixtures, so the key is intent, correct? The key is the intent, yes, Your Honor. The record indicates clearly the paddock's intent was to make it permanent. Thank you, Ms. Riley. Thank you very much. And thank you, Mr. Shortley. Thank you for appearing today by video. And I hope it all worked out well for you on your end. Well, I thank the court for allowing us to appear by video rather than having to make the trip to St. Louis today. Alright, thank you. You're both excused.